PER CURIAM.
We review the recommendation of the Judicial Qualifications Commission (JQC) that Judge Deborah Ford-Kaus be removed from her position as circuit court judge for the Twelfth Judicial Circuit. We have jurisdiction pursuant to article V, section 12 of the Florida Constitution. We have considered the record, Ford-Kaus’ written response, and oral argument. For the reasons expressed below, we affirm the JQC’s recommendation.
Ford-Kaus was elected as a circuit court judge in 1996. On August 19, 1997, the JQC charged Ford-Kaus with violating numerous Rules of Professional Conduct[1] as well as *271 Canons 1 and 2 of the Code of Judicial Conduct.[2] The charges related to conduct *272 that occurred prior to Ford-Kaus becoming a circuit judge as well as to conduct that took place during her time on the bench. The charges primarily concerned Ford-Kaus’s representation of one of her clients, Tricia McBee. A formal hearing was conducted and the JQC submitted its Findings of Fact, Conclusions of Law, and Recommendation on May 20, 1998. The JQC made the following findings of fact:
Deborah Ford-Kaus was elected as a Circuit Judge on November 5, 1996 and assumed her judicial duties on January 6, 1997. She graduated from law school in 1977 and began the actual private practice of law in 1986. She is a member of the Bar in the states of Texas, New York, Massachusetts and Florida. She served briefly as an Assistant State Attorney in the 12th Circuit and then engaged in private practice doing primarily family law in the Sarasota County area. She was joined in her practice by attorney Linda Griffin in August of 1994. Although they practiced together, they did not share fees, had their own separate bank accounts and were not a trae partnership. Disputes over the McBee case have resulted in a total split between two former friends and Linda Griffin had the locks on the office changed to exclude Judge Ford-Kaus.
In June of 1996, then attorney Ford-Kaus entered into a written contract to handle an appeal in a family law matter on behalf of Ms. McBee. The case concerned an order modifying the primary residential custody of Ms. MeBee’s minor child. This appeal required expedited treatment and McBee was, of course, the appellant. The appeal was mishandled from the beginning by then attorney Ford-Kaus who had almost no appellate experience, having previously worked on only a part of one appeal. She previously wrote an amended Answer Brief under direction of a partner. The brief was stricken, but she was allowed to present oral argument and the case was a PCA in her client’s favor. The McBee appeal was initially filed in the wrong court and the record was delayed by inaction by counsel. A stay should have been sought and the case should have been expedited because it concerned custody of a minor. These steps were not attempted by Judge Ford-Kaus. Expert opinion evidence as to the mishandling of the appeal was accepted over objection.
Apparently, because of the time constraints of running for judicial office, the case was referred to another lawyer to write the brief. Mr. Dwight Olsen was a friend of Linda Griffin and he agreed to research and write the brief for Judge Ford-Kaus for a flat fee of $1,000. He had no idea if McBee had been advised that he was to write the brief nor did he know what the client was to be billed. He considered Judge Ford-Kaus, whom he met only by phone, as the “client.” The brief took him considerably more time than he anticipated, but he charged only $1,028.45, the flat fee plus costs. He was paid this amount and furnished the brief in a form expecting that Judge Ford-Kaus would insert the necessary references to the trial transcript. He had the almost finished draft in Judge Ford-Kaus’ hands on October 31,1996, anticipating a filing by November 8,1996.
The due date on the brief in the Second District Court of Appeal was Friday, November 8, 1996, a date which Judge Ford-Kaus had asked the Court to grant her in her motion for a 45 day extension. The brief was actually filed on November 19, 1996 after being Federal Expressed from Judge Ford-Kaus’ office on November 18, 1996. Obviously, the brief was 10 days overdue, but the Court accepted the late brief and did not grant the Motion to Dismiss the appeal because of the late filing.
*273 Generally, the District Courts do not dismiss cases for such minor infractions. The Court did strike the brief and allow an amended brief because it lacked record references which Judge Ford-Kaus should have realized. After newspaper publicity, the representation of McBee on the appeal was eventually taken over by another lawyer with considerable appellate experience who agreed to the representation on a pro bono basis. The last brief in the case had been filed shortly before the hearing of March 2,1998.
Judge Ford-Kaus charged her client McBee more than $9,000 in fees and never advised that Mr. Olsen had done all of the work on the brief for a $1,000 fee, plus $28 in costs. When Ms. McBee conferred with Judge Ford-Kaus on January 3, 1997 which was the Judge’s final meeting in her office before assuming her judicial duties, the brief and the overall status of the appeal was the subject of their discussion. McBee, who brought a witness and made specific notes, asked Judge Ford-Kaus if she had written the brief and if it had been timely filed. Ms. McBee had already called the clerk of the Second District Court of Appeal and knew the brief was late. However, Judge Ford-Kaus specifically told her client that she had, in fact, written the brief and that the brief had been timely filed. Judge Ford-Kaus even went so far as to tell McBee that the clerk of the District Court was in error.
At this point, it was clear beyond a reasonable doubt that Judge Ford-Kaus knew the brief had been filed late and well-knew that Mr. Olsen had written the brief. Mr. Olsen’s name was on one of the records and McBee stated that she asked who he was and was told he was an “assistant.” By clear and convincing evidence, the Panel concludes that Judge Ford-Kaus was knowingly untruthful to her client. Judge Ford-Kaus would later admit to telling her client “white lies” during the meeting. The Panel also concludes that the Motions to Dismiss and Strike the brief served December 2, 1996 were, in fact, received by Judge Ford-Kaus prior to the meeting of January 3,1997.
The brief which was actually filed with the Second District Court of Appeal was received in evidence. The brief contains a certificate of service signed by “Deborah Ford-Kaus.” A blank line in the certificate of service with handwritten dates is extremely confusing. It shows the number “8th” to have been written over and the number “10th” or possibly “18th” superimposed. The numeral “10” is the most prominent and it is most likely that the “8th” was initially written and then changed to the “10th.” It is unquestioned that this brief was in fact Federal Expressed out of Judge Ford-Kaus’ office on November 18, 1996. The brief was also accompanied by a letter dated November 10, 1996 which advised the clerk that the original brief was being forwarded that date. November 10, 1996 was a Sunday and this letter dated the 10th containing no handwritten mailing information was also Federal Expressed on the 18th and was certainly an attempt to mislead. Based upon all of the evidence, the Panel concludes that the certificate of service on the brief constituted intentional back-dating and this plus the letter were false and an attempt to mislead the Court and counsel. The late filing of any court document may certainly be a serious matter but it is often understandable and remediable. However, intentionally inserting a false certification date is a misrepresentation of a much more serious nature.
The election occurred on Tuesday, November 5, 1996 and the Ford-Kaus billing records in her own handwriting showed work on the appeal of 8 hours on November 6, 8 hours on November 7 and 8 hours on November 8. The clear and convincing evidence, as accepted by the Panel, showed that Judge Ford-Kaus did no work whatsoever on these days and merely visited her office to pickup congratulatory messages on the days after her election. Judge Ford-Kaus also did not deny these allegations in her Answer and merely stated there was a “billing error” due to unusual circumstances which affected her judgment. When McBee asked about the bills for November 6, 7, and 8, Judge Ford-Kaus told her the dates were wrong. *274 The Panel concludes that the insertion of 8 hours per day for three days in a row was & conscious act and that Judge Ford-Kaus’ attempted explanations given on several occasions have been inconsistent and untruthful. The Commission concludes that Judge Ford-Kaus has been untruthful concerning her bills to both her client and to the JQC Investigatory Panel.
These billings of 8 hours per day had been brought to the attention of Judge Ford-Kaus during discovery in the McBee lawsuit against her over the bill and during the 6(b) hearing by the JQC Investigatory Panel. Judge Ford-Kaus has now admitted that the bills were “clearly excessive” but she was untruthful in her explanation to her client and the Investigatory Panel. At the 6(b) hearing, she blamed the bills on a secretary when she did not even have a secretary at the time. Her explanation during the trial that she thought she was being questioned by Commissioner Tate at the 6(b) hearing about bills in general rather the specific bills for 8 hours per day is rejected as unreasonable and unbelievable as is her testimony that she never looked at her bills until the 6(b) hearing.
As to the specific allegations of lying in the 6(b) hearing of July 25,1997, the Hearing Panel concludes that subparagraph (A) concerning a secretary preparing the bills was established as false. Judge Ford-Kaus eventually admitted she had no secretary at the time in question. Paragraphs (B) and (C) were situations where Judge Ford-Kaus phrased her answers in a manner calculated to mislead the Investigatory Panel.
Judge Ford-Kaus has been further untruthful to this Hearing Panel in attempting to explain her position regarding these bills. Judge Ford-Kaus testified as follows:
BY MR. SMITH:
Q What is that, Judge?
A This is the billing format that was used routinely in my office, and this shows three billings to-or about Tricia McBee during November just immediately after the election....
Q Is that your handwriting?
A Yes, it is.
Q What does that purport to show? What is that-why was that made?
A I-this is probably the most critical question that I’m going to have to answer during this entire proceeding because this document appears to show something about my frame of mind in this case that simply was not the case.
I can tell you-before I tell what-if you’ll just allow me a second, Counsel.
I can tell you just as a start-off that if I-if I were sitting in my own judgment and if I was sitting in your place, I would have a lot of difficulty with my explanation to-to you about why I did not intend to overbill Ms. McBee.
This thing shows an absolutely implausible number of work hours for the period of time post-election. And I did not spend 24 hours working for Trish McBee on the three days after the election. There’s no question about that.
I did, however, surround myself beginning immediately after the election for approximately the next ten days with her materials, her briefs, her transcripts, the research. And I was struggling with trying to do something with this brief. Ultimately, I did not do anything productive.
Why I wrote down time that made it look as though I was productive, I just can’t answer. To tell you the truth, I didn’t even know this document existed until it was shown to me by counsel at my deposition. I had no recollection of it. I knew it was my writing. I knew I must have done it.
I’m taking responsibility for overbill-ing this client, but I just cannot believe that I ever said to myself, “You know, if I just write all this down, no one will ever know this and I’ll just get the money for it.” It’s just-I’d never done it; I couldn’t do it; I didn’t do it.
Under In Re Davey[Inquiry Concerning Davey], 645 So.2d 398 (Fla.1994), we are mindful that Judge Ford-Kaus is entitled to notice before any new charges are brought and the lack of truthfulness before *275 this Panel cannot be viewed as a new charge. The result of this proceeding would be the same notwithstanding Judge Ford-Kaus’ lack of truthfulness in this trial. The Hearing Panel does conclude that the 8 hours per day was false and that Judge Ford-Kaus did not surround herself with working on the brief for the next 10 days after the election. She filed the Olsen brief without changing a single word. She did absolutely nothing productive or otherwise on this brief. This was a very simple brief. The factual statement was 17 lines long and lacked transcript references. The argument section was 6 pages in length. Mr. Olsen was never even contacted by Judge Ford-Kaus after writing the brief in October.
MeBee paid $9,376 (including transcript costs) through October, 1996 and was entitled to a partial refund for an overpayment at that point. She then received a further November 15, 1996 bill in the additional amount of $4,232 for fees and expenses. Thus, Judge Ford-Kaus charged Ms. MeBee well over $9,000 in fees for the appeal which actually consisted only of filing the unchanged Olsen brief. Judge Ford-Kaus has now admitted these charges were “clearly excessive” and that MeBee received no valuable services from her as a result of this fee. There was both an overcharge and a substantial misrepresentation to the client as to the actual services performed.
MeBee paid in cash and Judge Ford-Kaus has also agreed that she deposited some of the cash payments directly into her own operating account and spent the money rather than depositing the payment into a trust account as a credit against future fees and services. Judge Ford-Kaus was in the process of running for election and she was under very difficult financial constraints. She has admitted violations of the rules regarding trust accounts in her answer and these violations are found by clear and convincing evidence.
Judge Ford-Kaus was asked by her client MeBee to return the sums paid her, but she wrongfully refused to do so. Judge Ford-Kaus has admitted that a part of her reason for not repaying the fees was her displeasure with the attorney who replaced her in the appeal. This attorney had a relationship with a political adversary. The MeBee suit against Judge Ford-Kaus was initially defended and then settled for $20,000.
On January 3, 1997, a last meeting occurred between Judge Ford-Kaus, client MeBee and attorney Linda Griffin. MeBee attended this meeting with a witness and very specific notes resulted. The Panel finds MeBee to be credible. She testified and the evidence supports the fact that she specifically asked Judge Ford-Kaus if she had written the brief and whether it was timely filed and that the answers to both questions was a clear, yes. Judge Ford-Kaus later denied telling her that she had written the brief, but agreed that she certainly had not told her that she had not written the brief. She did not identify Mr. Olsen as the brief writer. The Panel finds that the authorship of the brief was misrepresented.
Attempts were made by Judge Ford-Kaus to convince MeBee that Linda Griffin should take over the appeal. Linda Griffin disagreed and felt she was unqualified to handle the matter. After sitting in on the entire meeting, Linda Griffin concluded that Judge Ford-Kaus was not telling the truth. Linda Griffin told Judge Ford-Kaus after the meeting to apologize to MeBee and to refund the fees to her. Judge Ford-Kaus very strongly refused “to give ... [her] a dime.”
Later, Judge Ford-Kaus prepared a letter (the pink letter), and suggested that Griffin sign it. This letter would have refused further MeBee appellate representation by Griffin on the grounds that MeBee had become adversarial and confrontational with Griffin. Linda Griffin refused to sign this letter and testified it was false. Judge Ford-Kaus testified the pink letter was only a suggested draft and was merely “venting” of hostility on her part. Judge Ford-Kaus left messages for Linda Griffin after she became a judge and although not specifically charged as violations these telephone messages show that *276 undue pressure was being put on Griffin to issue the letter which she said was simply not true. The Panel finds that Griffin’s and McBee’s versions of the facts are accurate and that the pink letter was absolutely untrue.
After taking office as a circuit judge, two lawyers represented Judge Ford-Kaus in her pending civil litigation matters of a personal nature. These two lawyers were initially Debra Salisbury and then Kate Halvorsen. Judge Ford-Kaus did not advise the parties or counsel of her relationship with Ms. Halvorsen when she appeared before her in contested matters. Judge Ford-Kaus disputed many of the details as to these assertions, but she was clearly aware of her duty to disclose to all that an attorney in her courtroom was also personally representing her. This conduct, while functioning as a judge, would directly destroy public confidence in the integrity and impartiality of Judge Ford-Kaus.
Judge Ford-Kaus also testified in her well-publicized deposition that she had lied to her client, but chose to characterize her statements as a “white lie.” She retreated from this position during her testimony before the Hearing Panel, but again, public confidence in the integrity of the judiciary has been substantially lessened. While even “white lies” are unacceptable, these falsehoods were serious and substantial.
We reject the assertion that the stress of an election and the closing of a practice justify or mitigate the violations established herein.
All of the above factual findings are based upon clear and convincing evidence as further supported by the factual admissions contained in the Answer and Defenses.
(Record citations omitted.)
Based on this factual predicate, the JQC concluded that Ford-Kaus violated Canons 1 and 2 of the Code of Judicial Conduct as well as rules 4-1.1, 4-1.3, 4-1.4, 4-1.5, 4-1.15, 4-1.16, and 4-3.2 of the Rules of Professional Conduct. The JQC determined that Ford-Kaus’s conduct demonstrated a present unfitness to hold judicial office. Accordingly, the JQC recommended that Ford-Kaus be removed from her position as circuit judge.
On appeal, Ford-Kaus claims that the evidence in this case is not clear and convincing.[3] In In re Graziano, 696 So.2d 744, 753 (Fla.1997), this Court outlined the procedure for reviewing findings of fact in judicial inquiries:
Before reporting findings of fact to this Court, the JQC must conclude that they are established by clear and convincing evidence. In re McAllister, 646 So.2d 173, 177 (Fla.1994). This Court must then review the findings and determine whether they meet this quantum of proof, a standard which requires more proof than a “preponderance of the evidence” but the less than “beyond and to the exclusion of a reasonable doubt.” In re Davey [Inquiry Concerning Davey], 645 So.2d 398, 404 (Fla.1994). If the findings meet this intermediate standard, then they are of persuasive force and are given great weight by this Court. See In re LaMotte, 341 So.2d 513, 516 (Fla.1977). This is so because the JQC is in a position to evaluate the testimony and evidence first-hand. See In re Crowell, 379 So.2d 107 (Fla.1979). However, the ultimate power and responsibility in making a determination rests with this Court. Id.
Based upon our independent review of the record, we find that the JQC’s findings are supported by clear and convincing evidence.
We next turn to the appropriate sanction for Ford-Kaus’s misconduct. In Grazi-ano, this Court stated:
Removal is the ultimate sanction in judicial disciplinary proceedings. We approve recommendations from the JQC that a judicial officer be removed when we conclude that the judge’s conduct is fundamentally inconsistent with the responsibilities of judicial office.
*277 696 So.2d at 753. We agree with the JQC that Ford-Kaus’s actions in this ease were inconsistent with the responsibilities of a judicial officer and that she is presently unfit to hold judicial office. The judicial system can only function if the public is able to place its trust in judicial officers. Ford-Kaus’s conduct demonstrates a pattern of deceit and deception. That pattern, particularly as it relates to her own client, casts serious doubt on her ability to be perceived as truthful by those who may appear before her in her courtroom. Such conduct diminishes the public’s confidence in the integrity of the judicial system. Therefore, we agree with the JQC that removal from judicial office is the appropriate sanction.
Accordingly, we approve the findings and recommendations of the JQC. Deborah Ford-Kaus is hereby removed as circuit judge for the Twelfth Judicial Circuit of Florida, effective upon this opinion becoming final.
It is so ordered.
HARDING, C.J., SHAW, WELLS, ANSTEAD, and PARIENTE, JJ., and OVERTON and KOGAN, Senior Justices, concur.

. The JQC asserts that Ford-Kaus violated the following Rules of Professional Conduct: 4-1.1, 4-1.3, 4-1.4, 4-1.5, 4-1.15, 4-1.16, and 4-3.2.
Rule 4-1.1, entitled “Competence,” states:
A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.
Rule 4-1.3, entitled "Diligence,” states:
A lawyer shall act with reasonable diligence and promptness in representing a client. Rule 4-1.4, entitled “Communication,” states:
(a) Informing Client of Status of Representation. A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) Duty to Explain Matters to Client. A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.
Rule 4-1.5, entitled “Fees for Legal Services,” states in relevant part:
(a) Illegal, Prohibited, or Clearly Excessive Fees. An attorney shall not enter into an agreement for, charge, or collect an illegal, prohibited, or clearly excessive fee or a fee generated by employment that was obtained through advertising or solicitation not in compliance with *271 the Rules Regulating The Florida Bar. A fee is clearly excessive when:
(1)after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee exceeds a reasonable fee for services provided to such a degree as to constitute clear overreaching or an unconscionable demand by the attorney;
[[Image here]]
[[Image here]]
(e) Duty to Communicate Basis or Rate of Fee to Client. When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.
[[Image here]]
(g) Division of Fees Between Lawyers in Different Firms. Subject to the provisions of subdivision (f)(4)(D), a division of fee between lawyers who are not in the same firm may be made only if the total fee is reasonable and:
(1) the division is in proportion to the services performed by each lawyer; or
(2) by written agreement with the client:
(A) each lawyer assumes joint legal responsibility for the representation and agrees to be available for consultation with the client; and
(B) the agreement fully discloses that a division of fees will be made and the basis upon which the division of fees will be made.
Rule 4-1.15, entitled "Safekeeping Property," states:
(a) Clients’ and Third Party Funds to be Held in Trust. A lawyer shall hold in trust, separate from the lawyer’s own property, funds and property of clients or third persons that are in a lawyer's possession in connection with a representation. All funds, including advances for costs and expenses, shall be kept in a separate account maintained in the state where the lawyer’s office is situated or elsewhere with the consent of the client or third person, provided that funds may be separately held and maintained other than in a bank account if the lawyer receives written permission from the client to do so and provided that such written permission is received prior to maintaining the funds other than in a separate bank account. In no event may the lawyer commingle the client’s funds with those of the lawyer or those of the lawyer’s law firm. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property, including client funds not maintained in a separate bank account, shall be kept by the lawyer and shall be preserved for a period of 6 years after termination of the representation.
(b) Notice of Receipt of Trust Funds; Delivery; Accounting. Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
(c) Disputed Ownership of Funds. When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be treated by the lawyer as trust property, but the portion belonging to the lawyer or law firm shall be withdrawn within a reasonable time after it becomes due unless the right of the lawyer or law firm to receive it is disputed, in which event the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.
(d) Compliance With Trust Accounting Rules. A lawyer shall comply with The Florida Bar Rules Regulating Trust Accounts.
Rule 4-1.16, entitled "Declining or terminating representation,” states in relevant part:
(a) When Lawyer Must Decline or Terminate Representation. Except as stated in subdivision (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:
(1) the representation will result in violation of the Rules of Professional Conduct or law;
(2) the lawyer’s physical or mental condition materially impairs the lawyer’s ability to represent the client; or
(3) the lawyer is discharged.
Rule 4-3.2, entitled "Expediting litigation,’’ states:
A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

. Canon 1 of the Code of Judicial Conduct, entitled, "A Judge Shall Uphold the Integrity and Independence of the Judiciary,” states:
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.
Canon 2, entitled "A Judge Shall Avoid Impropriety and the Appearance of Impropriety in all of the Judge’s Activities,” states:
A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
B. A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge *272 shall not .lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.
C. A judge should not hold membership in an organization that practices invidious discrimination on the basis of race, sex, religion, or national origin. Membership in a fraternal, sororal, religious, or ethnic heritage organization shall not be deemed to be a violation of this provision.

. Ford-Kaus claims that it was improper for witness Jane Kreusler-Walsh to render an opinion as to whether or not Ford-Kaus backdated the McBee brief. We find no merit to this argument.