# Supreme Court of Florida

_____

No. SC13-1333

_____

**INQUIRY CONCERNING A JUDGE, NO. 12-613
RE: LAURA MARIE WATSON.**

[June 18, 2015]

PER CURIAM.

This matter is before the Court to review the determination of the Florida Judicial Qualifications Commission ("JQC") that Laura Marie Watson has violated the Rules Regulating Professional Conduct and its recommendation that she be removed from office. We have jurisdiction. See art. V, § 12, Fla. Const. Article V, section 12(c)(1) of the Florida Constitution provides that we "may accept, reject, or modify in whole or in part the findings, conclusions, and recommendations of the commission . . . ." Further, section 12(c)(1) provides that "[m]alafides, scienter, or moral turpitude on the part of a justice or judge shall not be required for removal from office of a justice or judge whose conduct demonstrates a present unfitness to hold office." And, while we are mindful that removal is the ultimate sanction, "we will impose that sanction when we conclude

that the judge's conduct is fundamentally inconsistent with the responsibilities of judicial office." In re Hawkins, 151 So. 3d 1200, 1202 (Fla. 2014) (citing In re Shea, 759 So. 2d 631, 638 (Fla. 2000)).  For the reasons we explain below, we conclude that the JQC's findings and conclusions are supported by clear and convincing evidence and agree with the JQC's recommendation that Judge Watson be removed from the bench.

## FACTS AND PROCEDURAL HISTORY

At some point prior to 2002, the law office of Laura M. Watson, P.A. d/b/a Watson & Lentner entered into a joint business plan with Marks & Fleischer, P.A., and Kane & Kane, acting through the firm principals, Gary Marks, Amir Fleischer, Charles Kane, Harley Kane, Darin James Lentner, and Watson (collectively, "the PIP attorneys"), to represent healthcare provider clients in numerous lawsuits involving Personal Injury Protection ("PIP") claims against Progressive Insurance Company.  The firms shared expenses for marketing and the procurement of clients.  Each firm maintained and managed its own clients and files, but entered into joint representation contracts in which all of the firms agreed to represent the clients and assume joint responsibility for the claims.  The PIP attorneys alleged that Progressive had systematically underpaid health care providers in a scheme known as a "silent PPO."

The PIP attorneys retained the services of Slawson Cunningham Whalen & Stewart, P.A., to initiate a bad-faith case against Progressive filed in the name of Drs. Fisher & Stashak, M.D., P.A. d/b/a Gold Coast Orthopedics and Gold Coast Orthopedics and Rehabilitation ("Gold Coast"). Todd Stewart was the attorney working the case. When Todd Stewart left Slawson Cunningham, and formed Todd S. Stewart, P.A., he elicited the help and expertise of his father, Larry Stewart of Stewart Tilghman Fox & Bianchi, P.A.

In or about February 2002, the PIP attorneys met with Larry Stewart to discuss the Gold Coast case and bad faith claims. Larry Stewart eventually asked William C. Hearon to assist with the prosecution of the bad faith claims. (Todd Stewart, William C. Hearon, and Larry Stewart are collectively referred to as the "bad faith attorneys.")

On or about April 24, 2002, the PIP attorneys and bad faith attorneys reached an agreement concerning how the work would be handled and the fees to be split. The clients were to receive sixty percent of the recovery and the attorneys' fees would amount to forty percent. Of the attorneys' fees, the bad faith attorneys were to receive sixty percent.

Initially, the Gold Coast case encompassed approximately 40 health care providers, and it was contemplated that the bad faith claims would ultimately be asserted on behalf of all the clients of the PIP attorneys once those claims became

perfected, which was approximately 441 clients. This list of 441 clients was used in settlement negotiations with Progressive.

The bad faith attorneys participated in extensive discovery in which they were successful in obtaining an order compelling Progressive to produce internal documents. During this time, the PIP attorneys continued to encourage the bad faith attorneys to pursue their claims by joining in the bad faith claims, or by settling the PIP claims while preserving the bad faith claims. Due to the pressure placed on Progressive by the bad faith attorneys over the following two years, Progressive commenced settlement negotiations with both sets of attorneys. On numerous occasions, the PIP attorneys referred settlement negotiations of the bad faith claims to the bad faith attorneys and gave full authority to the bad faith attorneys to negotiate a global settlement of all of the bad faith claims, including the ones filed through the PIP attorneys.

On January 21, 2004, the bad faith attorneys met with Progressive and demanded $20 million to settle all of the bad faith claims and reported this to the PIP attorneys. Progressive counter-offered with a $3.5 million settlement of all the bad faith claims, but the bad faith attorneys did not accept the offer and no settlement was reached. The bad faith attorneys continued to pressure Progressive to produce more documents.

On May 14, 2004, the PIP attorneys accepted an aggregate settlement offer from Progressive in an undifferentiated amount of $14.5 million to settle the PIP claims as well as all bad faith claims, perfected or potential, without notifying the bad faith attorneys. After the settlement was accepted, Progressive and the PIP attorneys drafted a memorandum of understanding ("MOU"), which made clear that the settlement applied to all PIP claims and bad faith claims irrespective of whether they were perfected.

The MOU did not allocate any recovery to the bad faith claims, but required the release of those claims. After learning of the MOU, the bad faith attorneys objected. The PIP attorneys amended the MOU to award $1.75 million to the bad faith claims.

The PIP attorneys then notified their clients, via letter, of the settlement but did not disclose the conflicts of interests, provide closing statements, or advise the clients of the material facts necessary to make an informed decision about their cases or execution of the releases.

On or about June 22, 2004, the PIP attorneys received funds from Progressive, which were placed in the attorneys' respective trust fund accounts. Watson's firm received $3,075,000, from which $361,470.30 was paid to clients. The clients still did not receive closing statements.

The bad faith attorneys notified the PIP attorneys that, in accordance with The Florida Bar rules governing claims of disputed property, all of the attorneys' fees should be held in a separate escrow account. The PIP attorneys did not hold the funds.

The bad faith attorneys subsequently sued the PIP attorneys for fraudulent inducement and in quantum meruit for the work they performed. During the bench trial, Judge David Crow carefully reviewed all of the facts and circumstances surrounding the joint business plan between the PIP attorneys and the bad faith attorneys.

In April 2008, the trial court found that the actions taken by the PIP attorneys, including the settlement of the bad faith claims without notifying the bad faith attorneys or notifying the clients with bad faith claims that their claims would be released and they would be receiving little to no compensation for those claims, violated several rules of professional conduct. The trial court also found that the PIP attorneys exaggerated the number of hours they spent working on these PIP and bad faith claims. Ultimately, the trial court awarded the bad faith attorneys additional attorneys' fees due to an unjust enrichment the PIP attorneys received and for the cost of the work performed by the bad faith attorneys during the two-year span. Additionally, Judge Crow sent a copy of his order to The Florida Bar.

The Florida Bar began grievance proceedings against the PIP attorneys. In her response, Watson requested that the prosecution be deferred until after she finished appealing Judge Crow's April 2008 final judgment. The Fourth District Court of Appeal affirmed the trial court's judgment on February 29, 2012, see Kane v. Stewart Tilghman Fox & Bianchi, P.A., 85 So. 3d 1112, 1113 (Fla. 4th DCA 2012), and the Bar proceeded with its investigation.

In June 2012, Watson was advised that her case was being referred to a grievance committee for probable cause review, and then in October 2012, she was advised that the grievance committee had found probable cause. In November 2012, Watson was elected to the Seventeenth Judicial Circuit; she assumed office in January 2013. Accordingly, The Florida Bar forwarded its file to the JQC; additionally, Larry Stewart filed a formal complaint.

On July 24, 2013, the JQC filed a Notice of Formal Charges against Judge Laura Marie Watson alleging that she violated Canons 1 and 2A of the Code of Judicial Conduct and violated Florida Rules of Professional Conduct 3-4.2, 3-4.3, 4-1.4(a), 4-1.4(b), 4-1.5(f)(1), 4-1.5(f)(5), 4-1.7(a), 4-1.7(b), 4-1.7(c), 4-1.8(g), 4-8.4(a), 4-8.4(c), and 5-1.1(f).

At the conclusion of its proceedings, the JQC determined that:

> Watson and the others hired Larry Stewart, who warned them in advance that the PIP claims and bad faith claims were adverse, requiring careful handling throughout settlement negotiations, with full client transparency. When Progressive dangled a pot of money,

ethical restraints were swept aside. Watson and the PIP lawyers (at Progressive's insistence) excluded the only attorney sufficiently experienced and knowledgeable to see them through settlement negotiations, and reached a quick (and ethically flawed) settlement agreement.

"Watson never told her PIP clients that Progressive paid funds to settle the bad faith claims, and they weren't allowed to participate in that recovery, despite the fact they were required to release these claims." The JQC concluded that Watson unilaterally decided that those clients had no interest in the bad faith case and that they had no duty to pay or include unknown people who may or may not someday have a claim. Additionally, the JQC concluded that Watson "entered into an undisclosed side deal with Gold Coast, contrary to the interests of the other bad faith claimants," and further concluded that Watson failed to disclose material information to her clients, including the conflicts of interest and the methodology of allocating funds between the PIP and bad faith claims that substantially decreased the funds available for distribution to the clients. Under this methodology, the PIP attorneys took $10,960,000 in fees in addition to their portion of the Gold Coast attorneys' fees.

Based on these facts, the JQC concluded that

attorney Watson violated R. Reg. Fla. Bar 3-4.2 (violating Rules of Professional Conduct); 3-4.3 (commission of acts contrary to honesty or justice); 4-1.4(a) (failing to keep clients informed about the status of a matter); 4-1.4(b) (failing to explain matter to the extent reasonably necessary to permit clients to make informed decision regarding the representation); 4-1.5(f)(1) (failing to provide written

- 8 -

statement to bad faith clients stating the outcome of the matter, the remittance to the client, and the method of its determination); 4-1.5(f)(5) (failing to provide closing statements to bad faith clients reflecting an itemization of costs and expenses, together with the amount of fees received by participating lawyers or firms); 4-1.7(a) (representing clients with directly adverse interests); 4-1.7(b) (representing clients where representation was materially limited by lawyers' responsibilities to other clients, third persons, and the lawyers' own interests); 4-1.8(g) (making an aggregate settlement of the claims of two or more clients without requisite disclosure or consent); 4-8.4(a) (violation of the Rules of Professional Conduct by herself, and through the acts of others); 4-8.4(c) (engaging in conduct involving deceit); and 5-1.1(f) (failing to treat disputed funds as trust property).

Additionally, the JQC concluded that "[t]here was no clear and convincing evidence presented, and Judge Watson is not guilty of violating Rule 4-1.7(c) . . . ."

Based on these findings and conclusions, the JQC determined that Judge Watson "sold out her clients, her co-counsel, and ultimately herself. This conduct is 'fundamentally inconsistent with the responsibilities of judicial office,' and mandates removal."

## ANALYSIS

In judicial disciplinary proceedings, this Court reviews the findings of the JQC to determine if they are supported by clear and convincing evidence, and reviews the recommendation of discipline to determine whether it should be approved. In re Andrews, 875 So. 2d 441 (Fla. 2004). Clear and convincing evidence is " 'a standard which requires more proof than a "preponderance of the evidence" but less than "beyond and to the exclusion of a reasonable doubt." ' " In

re Henson, 913 So. 2d 579, 589 (Fla. 2005) (quoting In re Graziano, 696 So. 2d 744, 753 (Fla. 1997)).  In In re Davey, 645 So. 2d 398 (Fla. 1994), this Court fleshed out its standard of review in JQC inquiries:

> This intermediate level of proof entails both a qualitative and quantitative standard.  The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.
> [C]lear and convincing evidence requires that the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue.  The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.

> Slomowitz v. Walker, 429 So. 2d 797, 800 (Fla. 4th DCA 1983).

Id. at 404; see also In re Holloway, 832 So. 2d 716, 726 (Fla. 2002).

Additionally, this Court has noted that any conflicts in the evidence should be resolved in favor of the JQC's findings.  In re Henson, 913 So. 2d 579, 591-92 (Fla. 2005) ("Resolving conflicts in the evidence in favor of the Hearing Panel's findings, we conclude that the accusation . . . is supported by clear and convincing evidence.").  According to article V, section 12(c)(1) of the Florida Constitution, this Court has discretion to either accept, reject, or modify the commission's findings and recommendation of discipline.  Although this Court gives the JQC's findings and recommendations great weight, the ultimate power and responsibility

- 10 -

in making a determination to discipline a judge rests with this Court. In re Angel, 867 So. 2d 379 (Fla. 2004).

We have emphasized that the object of these "proceedings is not for the purpose of inflicting punishment, but rather to gauge a judge's fitness to serve as an impartial judicial officer." In re McMillan, 797 So. 2d 560, 571 (Fla. 2001). "In making this determination, judges should be held to higher ethical standards than lawyers 'by virtue of their position in the judiciary and the impact of their conduct on public confidence in an impartial justice system.' " In re Hawkins, 151 So. 3d at 1212 (citing In re McMillan, 797 So. 2d at 571).

Additionally, at the outset, we note that despite Judge Watson's protestations to the contrary, the JQC and this Court have jurisdiction over her conduct. See In re Henson, 913 So. 2d at 588 ("Misconduct committed by an attorney who subsequently becomes a judge falls within the subject-matter jurisdiction of this Court and the JQC, no matter how remote. . . . JQC proceedings are constitutionally authorized for alleged misconduct by a judge during the time he or she was a lawyer."); see also In re Davey, 645 So. 2d at 403 ("[T]he Commission has constitutional authority to investigate pre-judicial acts and recommend to this Court the removal (for unfitness) or reprimand (for misconduct) of a sitting judge.").

- 11 -

We have reviewed the entire record of this proceeding and conclude that clear and convincing evidence supports the JQC's factual findings and conclusions that Judge Watson violated Florida Rules of Professional Conduct 3-4.2, 3-4.3, 4-1.4(a), 4-1.4(b), 4-1.5(f)(1), 4-1.5(f)(5), 4-1.7(a), 4-1.7(b), 4-1.8(g), 4-8.4(a), 4-8.4(c), and 5-1.1(f). The JQC heard testimony from Larry Stewart and Laura Watson; and as character witnesses, Thomas Lynch, IV, Terrence O'Connor, and Lawrence Kopelman. Larry Stewart, in particular, testified at length regarding the details of the agreement between the PIP attorneys and the bad faith attorneys. Larry Stewart stated that he could only say that Watson was present for each of the meetings he held with the PIP attorneys; he could not testify as to exactly what she said. Nevertheless, Larry Stewart testified that Watson never objected or corrected any of the agreements or understandings reached at those meetings. Stewart's interpretation of the meetings is bolstered in particular by one e-mail from Watson wherein she congratulated Stewart on getting the favorable discovery ruling and stated, "We need to keep our foot on their throat and not let them lose [sic]."

Watson's argument that she was not involved in making the agreement with Stewart's firm, and in fact had no knowledge of any agreement with Larry Stewart to pursue bad faith claims on behalf of any of her clients, including Gold Coast, or that she was not aware that he was in settlement negotiations with Progressive is not a reasonable inference from this record. Accordingly, Watson's arguments

- 12 -

were justifiably disregarded by the JQC. Watson's primary contention that the PIP attorneys never contracted with Larry Stewart's firm is belied by her e-mail correspondence with him and her admission that he won favorable rulings in the Gold Coast case.

As it relates to them, the clients were provided with a form release letter to sign that only disclosed the amount they would receive. The settlement was structured so that the clients would receive the PIP payment they were due from Progressive, and little or nothing towards the bad faith recovery. In exchange the bad faith claims were released. The clients were never informed of the entire amount of the offers of settlement received from Progressive, or even that there had been multiple offers. The clients were also not informed of the amount of the settlement that would be retained by the attorneys. In response to this allegation, Watson only offers that she complied with the contracts she had with her clients, which only provided for the PIP claim recovery. Additionally, the clients were never fully informed that the bad faith claims were not compatible with the PIP recovery claims. It is undisputed that Watson failed to provide closing statements to any of the clients. In fact, Watson stated that it is common practice for these types of cases not to have closing statements. Furthermore, it is undisputed that no client was aware of the aggregate settlement. Likewise, Watson did not obtain written consent for aggregate settlement.

Finally, after the bad faith attorneys disputed the settlement agreement, the PIP attorneys placed $710,000 in escrow in connection with the settlement of the Gold Coast case. The escrow account was created for the purpose of setting aside the forty percent attorneys' fees in that case. On or about May 31, 2006, Watson transferred $515,000 to the law firm of Stewart Tilghman Fox & Bianchi, P.A., leaving the remainder in dispute. Watson therefore agreed to disburse the balance subject to court control. On June 1, 2006, Judge Crow ordered that no further distributions from the account be made without further order of his court. On June 5, 2006, the bad faith attorneys executed a settlement agreement with all the PIP attorney firms except Watson & Lentner. Because the dispute between Watson and Stewart was not resolved until either Judge Crow entered his order in April 2008, or the appeal from his order become final in 2012, the JQC's finding is supported by clear and convincing evidence.

## CONCLUSION

As stated by Judge David Crow of the Fifteenth Judicial Circuit in and for Palm Beach County, the complex facts of the underlying case "could be a case study for a course on professional conduct involving multi-party joint representation agreements. . . ." We have previously found that a pattern of deceit and deception "casts serious doubt on [a judge's] ability to be perceived as truthful by those who may appear before her in her courtroom." In re Ford-Kaus, 730 So.

2d 269, 277 (Fla. 1999). Further, "[s]uch conduct diminishes the public's confidence in the integrity of the judicial system." Id. at 277. Under these circumstances, "removal from judicial office is the appropriate sanction," because Judge Watson's "conduct is fundamentally inconsistent with the responsibilities of judicial office." Id. at 276. Additionally, this Court has previously removed a judge from office for conduct that occurred, in part, while she was still a practicing attorney. See In re Hapner, 718 So. 2d 785 (Fla. 1998).

Based on the foregoing, we find that Judge Watson's actions while a practicing attorney, and her demeanor during these proceedings "cast[ ] serious doubts" on her "ability to be perceived as truthful by those who may appear before her in her courtroom." Accordingly, we find that removal is the appropriate sanction.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Original Proceeding – Judicial Qualifications Commission

Ricardo Morales, III, Chair, and Michael Louis Schneider, General Counsel, Tallahassee, Florida; Judge Kerry I. Evander, Hearing Panel Chair, Daytona Beach, Florida; Lauri Waldman Ross of Ross & Girten, Hearing Panel Counsel, Miami, Florida; Marvin E. Barkin and Lansing Charles Scriven of Trenam, Kemker, Scharf, Barkin, Frye, O'Neil & Mullis, P.A., Special Counsel, Tampa, Florida,

for Judicial Qualifications Commission, Petitioner

Robert A. Sweetapple and Alexander Demetrios Varkas, Jr., of Sweetapple, Broeker & Varkas, PL, Boca Raton, Florida; and Colleen Kathryn O'Loughlin of Colleen Kathryn O'Loughlin, P.A., Fort Lauderdale, Florida,

for Judge Laura Marie Watson, Respondent