PER CURIAM.
We have for review the recommendations from the Judicial Qualifications Commission (JQC) that Seminole County Judge Ralph E. Eriksson be publicly reprimanded and charged the costs of proceedings based upon findings that he violated the Code of Judicial Conduct. We have jurisdiction. See art. V, § 12, Fla. Const. For the reasons discussed below, we approve the JQC’s recommendations.
FACTS AND PROCEDURAL HISTORY
This case arises from formal charges filed by the JQC against Judge Ralph E. *582 Eriksson. In the Amended Notice of Formal Charges, the JQC accused Judge Eriksson of improper conduct in three counts, and the Hearing Panel of the JQC found against Judge Eriksson on two of them.[1]

Count I

In State v. Walton, N. 06-MM-012701-A (Seminole Cty. Ct.), the defendant was initially charged with possession of cocaine (a felony), driving under the influence (a misdemeanor), and driving in violation of a business purposes only license (a misdemeanor). The case was delayed while the suspect substance was subjected to testing in state laboratories. Six months later, after tests revealed the substance in question was not cocaine, the felony possession of cocaine charge was dropped and the case was transferred to county court for further proceedings.
On Monday, February 19, 2007, jury selection was scheduled to begin for the remaining two charges. Before jury selection commenced, the defense moved to sever the remaining charges, but Judge Eriksson denied the request. The defense and the State then jointly requested that the case be continued because they had been unable to agree on the admissibility of portions of a video of the traffic stop and subsequent arrest, which contained numerous references to cocaine that should be redacted. The State agreed to a redaction, but Judge Eriksson also denied that request, stating, “This would be the ninth month [that this case has been pending], so I have to believe that both sides are well prepared.” Shortly thereafter, the following dialogue occurred:
[Defense Attorney]: Judge, may we approach briefly?
Judge Eriksson: I can hear you.
[Defense Attorney]: Mr. Walton has expressed some concerns regarding the Court’s rulings here today. He asked if there’s anything possible that could be done about it, and I have advised him that it is possible to do a motion to recuse the Court. However, that is generally in writing and sworn to. Obviously, I’m not prepared to present that to the Court at this time. But he did wish me to express his concerns and that he would like me to present the Court with a motion to recuse the Court, and that he has concerns that he would not be able to get a fair — a fair trial before this Court, based on how the Court has presented itself to his counsel as well as the Court’s rulings here today, both against his counsel and against the State Attorney’s Office.
Unfortunately, I am not prepared with a written motion; however, I believe it would be proper to give us an opportunity to have Mr. Walton sign off and swear off on that and set it for a hearing.
Judge Eriksson: I believe that the law says that if you raise that, I am supposed to give you a reasonable period of time. What I’m going to do is give you a reasonable period of time.
[Pause]
Judge Eriksson: I’m going to move this case for another pretrial conference, February 27th, at one o’clock. I’m going to find that Bob Walton, under Rule 3.131 subsection E, subsection G(3), I’m not satisfied that his bail is sufficient for him to appear here prepared for trial. It appears that he, through his attorney, is not interested in a trial. I’m going to increase the bail in this case to $10,000. I’m going to remand him-to the custody *583 of the sheriff and cancel his present bail. He may post bail at any time.
[Defense Attorney]: Mr. Walton has asked me to inform the Court that if the Court wishes him to proceed with this matter today versus being put into custody, he’s happy to proceed to trial. The Court shouldn’t concern himself with Mr. Walton not wishing to proceed to trial, because he does.
Is that correct, Mr. Walton?
[The Defendant]: Yes, sir.
Judge Eriksson: All right. That will conclude our proceedings today in State of Florida versus Bob Walton.
After defense counsel again urged the court to reconsider its ruling, Judge Eriksson addressed, but abruptly dismissed, defense counsel’s concerns.
Judge Eriksson appeared before an Investigative Panel of the JQC on June 28, 2007, for a hearing pursuant to JQC Rule 6(b). See Fla. Jud. Qual. Comm’n R. 6. The hearing addressed, in part, alleged misconduct by Judge Eriksson during the Walton case.
At the Investigative Panel hearing, Judge Eriksson stated that Seminole County only selects jurors on Monday, and that some defendants attempt to manipulate the system by changing their pleas on a Monday to avoid trial for another week. Judge Eriksson mentioned that he relied on a decision by a peer judge, who had previously followed the same course of action when the defendant changed his plea. During that hearing the following dialogue occurred:
[Panel Member]: ... I’ve sat here the whole time, and I don’t think I’ve ever heard you specifically say what all the reasons were that you raised Mr. Walton’s bond from 3,500 to 10,000. Can you tell me what were your reasons specifically for raising the bond from 3,500 to 10,000.
Judge Eriksson: Do you mean how I arrived at—
[Panel Member]: I don’t want to know how, but why. You raised the bond from 35 to $10,000. Tell me why you did that.
Judge Eriksson: My thought process was he had shown — his bond was to show up for trial, in effect. I mean, there’s interim steps, but his bond was to show up for trial and be ready for trial because it was for trial. I saw no valid reason. And I felt that the reason of well, Judge, we just don’t think you’re fair, or whatever, and we’d like to have you recused, I felt like that was a last-gasp-without-basis reason that was an artificial reason, but under the law gives them a continuance. And I felt like that went to the integrity of the system when they can maneuver it like that.
[Panel Member]: Okay. Sir, let me just get this straight because I want to make sure that I’m hearing this. The sole reason that you raised that bond was that they made a motion for a recu-sal? That’s what I heard you just say.
Judge Eriksson: Yeah. I don’t think there was any other reason, because at that point the recusal says we aren’t having a trial. We’re at 4:00 o’clock. We don’t have any jurors later that week. I have to give them time. He said he needed some time, and I know the law says I have to give them time to go and prepare the motion. We’re not going to keep jurors there that evening. And so they have, in my opinion, artificially granted themselves a continuance.
[Panel Member]: I have no further questions.
The Investigative Panel found probable cause to proceed further and on September 6, 2007, the JQC filed a Notice of *584 Formal Charges against Judge Eriksson alleging, with regard to Count I, that Judge Eriksson effectively punished a defendant for exercising a legitimate legal right in violation of various canons of the Code of Judicial Conduct. The Notice of Formal Charges provided in Count I:

Count I

In State of Florida v. Bob Lee Walton, Seminole County Case # 06-MM-012701-A, Mr. Walton was charged with Driving Under the Influence and Driving in Violation of the terms and conditions of a Business Purposes License. This case had been previously charged in Circuit Court due to an allegation of Possession of Cocaine that was subsequently dropped.
a. Since there was a video of the traffic stop and the cocaine was mentioned on the video, counsel for the defendant had filed a motion to redact portions of the video. To accomplish this task, the State and the defense jointly moved to continue the case. The Court declined to do so, suggesting that the case had been pending too long.
b. Subsequently, the defendant asked his lawyer to file a Motion to Recuse. When told this, you expressed that you were not satisfied that the defendant’s bail of $3,500.00 was sufficient to insure his presence, so you revoked the bond, ordered a new $10,000 bond, and ordered the defendant taken into custody.
c. As a result the defendant was taken into custody and spent the next 11 hours in the Seminole County Jail until his family was able to arrange for bail.
d. When counsel for the defendant stated that his client was withdrawing his suggestion of recusal and was ready for trial, you ignored that statement, stating that you had granted the defendant’s motion to continue.
e. In response to questioning by the Investigative Panel of the Commission, you stated that the sole reason for revoking Mr. Walton’s bond and imposing a new bond was in response to his Motion to Recuse.
f. Your actions were calculated to punish the defendant for exercising a legitimate legal right, and so your actions were punitive and vindictive, undermining the orderly administration of justice.
g. This charge is governed by Canons 1, 2A, and 3B of the Code of Judicial Conduct. ■■

Count III

Count III of the JQC’s formal charges arose from Judge Eriksson’s open disagreement with the policy of the Eighteenth Judicial Circuit that required county judges to hear petitions for injunctions against domestic violence or repeat violence. Judge Eriksson wrote letters to both this Court and the Office of the State Courts Administrator contending that Seminole County was not complying with an administrative order, approved by this Court, that concerned such injunctions.
On October 30, 2007, Judge Eriksson presided over a series of domestic violence injunction hearings. The petitioners who sought protection, most of whom were pro se, appeared to have little, if any, experience with the legal system. Judge Eriksson was very formulaic and impersonal, providing no assistance whatsoever to the petitioners and he consistently made reference to his duty to remain neutral. The following is an example of a dialogue between Judge Eriksson and a pro se petitioner:
*585 Judge Eriksson: We’ll turn to the injunction docket. If you are Patrice Taylor, Patrick Taylor or Jeremy Rus-saw, would you step forward.
Are you Mr. Russaw?
Jeremy Russaw: Yes.
Judge Eriksson: All right. Would you step over to that table?
Patrice Taylor, is that you?
Patrice Taylor: Yes, sir.
Judge Eriksson: All right. Would you have a seat there.
Patrice Taylor, who will be your first witness?
Patrice Taylor: Your honor, I have none. My son was not in any shape to come. I don’t have any witnesses except for the police report and the witnesses who expressed to the police what happened because I was too distressed to explain.
Judge Eriksson: You can’t use a report because the other side can’t question what’s on that paper. You need to produce that person, whoever they are, so the other side can question them.
Patrice Taylor: I was unaware of that, your Honor.
Judge Eriksson: Well, I wasn’t the one who was supposed to give you advice.
Patrice Taylor: I’m sorry.
Judge Eriksson: So let’s go back and explore that statement. Where did you get the idea to file a petition?
Patrice Taylor: I filed a petition.
Judge Eriksson: Did somebody suggest it to you?
Patrice Taylor: No. I filed it because he was having some depression issues with—
Judge Eriksson: No, not why did he—
Patrice Taylor: The police department told me after I had repeated complaints of harassing and stalking and disturbances at my house.
Judge Eriksson: Did they tell you that you would need to bring a witness or two—
Patrice Taylor: No.
Judge Eriksson: — testify so the other side could cross-examine?
Patrice Taylor: No. I thought that the arrest would be enough. My son was in no shape to be here.
Judge Eriksson: If you are arrested, does that mean you’re guilty?
Patrice Taylor: No, your Honor.
Judge Eriksson: Okay. So unless you’re going to produce any witness or have anybody testify here today, I’ll have to deny your motion — or your petition. Do you understand that?
Patrice Taylor: Not quite, your Hon- or. He was arrested for stalking.
Judge Eriksson: That is not proof on your petition. That might be the start of a criminal proceeding, but—
Patrice Taylor: [cell phone rings]
I do apologize, your Honor. I’m scheduled to be at work.
Judge Eriksson: All Right. Are you too busy to be here?
Patrice Taylor: No, your Honor. This is my second time to be here. You were not able to hear the first time because he was never served the paper. And it’s been a nightmare trying to find this guy to locate him while he works—
Judge Eriksson: Just stay on course.
Will you be presenting any evidence today on your petition?
Patrice Taylor: I’m sorry?
Judge Eriksson: Will you be presenting any evidence on your petition?
*586 Patrice Taylor: I have — written documentation, if that’s what you mean. I don’t know.
Judge Eriksson: If it’s written, no. He can’t cross-examine whoever wrote it.
Patrice Taylor: I don’t know what else to say, your Honor. I just want this guy to leave me alone. That’s all I want, is for him to just stay away from me and my family. That’s all I want.
Judge Eriksson: Having presented no evidence here today, I’m going to have to deny your petition for injunction for protection against repeat violence. If each of you would step through — just step through the audience and you’re finished here today and you’ll have a copy of this in just a moment. And that will complete that hearing.
Judge Eriksson also dismissed injunction petitions that alleged repeat violence if the petitioner was only able to establish one act of violence. Further, Judge Eriksson refused to admit police reports and the petitioner’s own sworn statements because he considered them hearsay. Judge Eriksson also questioned petitioners as to who instructed them to come to court, asking them such questions as, “Who sent you here?” and “Who told you to file this?”
As the scheduled calendar proceeded Judge Eriksson became less rigid, and in some cases when he confronted a party with the “witness” issue, asked them to “look in the mirror” when identifying their first witness. As the hearings progressed, Judge Eriksson became less formalistic attempting to address the substance of the petitions pending before him.
Judge Eriksson appeared before a second Investigative Panel on February 28, 2007, for another 6(b) hearing. This hearing addressed the additional alleged misconduct by Judge Eriksson of the manner in which he conducted the series of injunction hearings on October 30, 2007. The Investigative Panel again found probable cause to proceed and on April 30, 2008, the JQC filed an Amended Notice of Formal Charges, alleging that Judge Eriksson employed an over-technical and rigid approach in conducting the proceedings seeking domestic violence injunctions in violation of the Code of Judicial Conduct. The Amended Notice of Formal Charges included three counts, Counts I and II, which were identical to the original charging document, and Count III which addressed the injunction hearings on October 30, 2007.
Count III as it appears in the JQC’s Amended Notice of Formal Charges provided:

Count III

In a series of cases in which pro se petitioners sought Injunctions against Domestic Violence or Injunctions for Repeat Violence, all heard on October 30, 2007 in Seminole County, Florida, you failed to properly accord those petitioners the right to be heard on their petitions by implying that the verified petitions were somehow insufficient even though the facts contained in the petitions were uncontested. It was suggested by the court that the petitioners were required to produce independent witnesses without acknowledging that the petitioners themselves could testify, as the law permits. This charge is governed by Canons 1, 2A, 3B (2), 3B (7) and 3B (8) of the Code of Judicial Conduct.
Rather than assisting the parties in understanding the process of obtaining a domestic or repeat violence injunction, you employed an unduly rigid and formulaic process in dealing with pro se litigants, so as to impede their ability to obtain the relief and protection they *587 sought from the court. This charge is governed by Canons 1, 2A, 3B (2), 3B (7) and 3B (8) of the Code of Judicial Conduct.

The Hearing Panel of the JQC

The two matters pending before the JQC were consolidated and presented to a Hearing Panel of the JQC. Prior to opening arguments, Judge Eriksson submitted a motion in limine seeking to preclude the use of any statements he made before the Investigative Panel. The Hearing Panel denied the motion.
Count I (The Walton Case)
The Hearing Panel found that Judge Eriksson “effectively punished Mr. Walton for exercising a legal right and that this result was punitive and gave the appearance of being vindictive.” The Hearing Panel further noted, “The public could certainly conclude that [defense counsel]’s requests for a stipulated continuance and his request to disqualify the judge had the effect of placing the client in jail.” The panel did recognize the witnesses who testified that Judge Eriksson is generally an extremely sincere and fair judge, but ultimately found Judge Eriksson’s actions to be in violation of the Code of Judicial Conduct.
The Hearing Panel noted that a retaliatory ruling in reaction to a request to disqualify a judicial officer constitutes a violation of the Code of Judicial Conduct. Abuse of judicial power in connection with motions for disqualification of a judge violates the Code. Good motives of a judicial officer are not a defense to and cannot justify conduct which violates the Code.
Count III (The Injunctions)
The Hearing Panel considered Judge Eriksson’s disagreement with the manner in which domestic violence matters are determined in his circuit as a “political dispute” similar to the circumstances of In re Barnes, 2 So.3d 166 (Fla.2009). The panel noted that, unlike other judges in the county, Judge Eriksson did not provide a preliminary general explanation to the petitioners and respondents. The panel considered Judge Eriksson’s demeanor that day to be cavalier and insensitive. The panel also noted, “[I]t was not up to the judge to make the hearsay objection for the respondent who did not make it himself.” The panel found:
Judge Eriksson obviously had a difficult time in attempting to balance the interests of the petitioners versus the interests of the respondents. Despite this difficulty in balancing it remains that a cause of action for an injunction exists, that petitioners are encouraged to apply pro se, and that it would not have been a breach of simple fairness to ask the petitioner whether he or she wished to testify.
After noting Judge Eriksson’s recognition of his own shortcomings, his remediation of his approach, and his engagement in counseling, the panel was confident no similar conduct will occur in the future. The panel thus concluded “that there should be no separate penalty over and above [a] reprimand.”
Based on these findings of misconduct as to Counts I and III, the Hearing Panel recommended a public reprimand by this Court and that Judge Eriksson be responsible for the costs associated with these proceedings.
ANALYSIS
Judge Eriksson asserts that (1) the JQC lacks jurisdiction over this case; (2) the Hearing Panel of the JQC was not authorized to consider Judge Eriksson’s testimony from the Investigative Panel hearing; and (3) the JQC did not establish Judge *588 Eriksson’s misconduct by clear and convincing evidence.
Jurisdiction
Judge Eriksson’s jurisdictional argument lacks merit. There is no question that this Court has jurisdiction to oversee the conduct of judges. See art. V, § 12, Fla. Const. The JQC also has jurisdiction to investigate alleged judicial misconduct. Article V, section 12(a)(1) of the Florida Constitution provides:
There shall be a judicial qualifications commission vested with jurisdiction to investigate and recommend to the Supreme Court of Florida the removal from.office of any justice of judge whose conduct, during term of office or otherwise ... demonstrates a present unfitness to hold office, and to investigate and recommend the discipline of a justice or judge whose conduct, during term of office or otherwise ... warrants such discipline.... The commission shall have jurisdiction over justices and judges regarding allegations that misconduct occurred before or during service as a justice or judge if a complaint is made no later than one year following service as a justice or judge. The commission shall have jurisdiction regarding allegations of incapacity during service as a justice or judge.
Although Judge Eriksson does not explicitly refer to the doctrine of judicial independence, his brief repeatedly refers to In re Allen, 998 So.2d 557 (Fla.2008), and the overall theme of his argument implies that the principles of judicial independence should have precluded the JQC from filing charges against him.
The doctrine of judicial independence does not afford judges the power to do as they please. This Court explained the expectations for judges in In re Turner, 421 So.2d 1077, 1081 (Fla.1982):
The duties, responsibilities, and powers entrusted to judges are awesome. Judges must necessarily have a great deal of independence in executing these powers, but such authority should never be autocratic or abusive. We judges must always be mindful that it is our responsibility to serve the public interest by promoting justice and to avoid, in official conduct, any impropriety or appearance of impropriety. We must administer our offices with due regard to the system of law itself, remembering that we are not depositories of arbitrary power, but judges under the sanction of law. Judges are expected to be temperate, attentive, patient and impartial, diligent in ascertaining facts, and prompt in the performance of a judge’s duties. Common courtesy and considerate treatment of jurors, witnesses, court personnel, and lawyers are traits properly expected of judges. Court proceedings and all other judicial acts must be conducted with fitting dignity and decorum, reflecting the importance and seriousness of the inquiry to ascertain the truth.
This Court balanced the Turner standard for judges against the necessities of judicial independence in Allen, 998 So.2d at 565. In that case, although very different factually, this Court upheld a JQC panel’s determination that Judge Michael E. Allen violated the Code of Judicial Conduct when he issued a written opinion that personally attacked a judge on his court. In addressing the doctrine of judicial independence, this Court recognized that in the appellate context, “[gjenerally, appellate judges are free to write almost anything in their opinions regarding the decision of the case or the facts and law involved in the case. However, the discussion must be germane to the case at bar and the facts that [were] within the record of the case.” Id. at 565. In Allen we concluded that *589 Judge Allen used extrarecord materials to personally attack another judge and “[t]his type of action in a judicial opinion cannot be condoned, nor can it be protected by judicial independence.” Id. The Court cautioned:
While we find that the doctrine of judicial independence did not preclude the JQC from filing charges against Judge Allen for writing and releasing his concurring opinion in this case, we caution that our opinion today should not be viewed as a license for the JQC to judge and evaluate judicial opinions.

Id.

Judge Eriksson argues that his conduct was “germane to the case at bar and the facts that [were] within the record of the case.” Allen, 998 So.2d at 565. Implicit in his argument is an attempt to superimpose language from the Allen decision as an exclusive standard demarcating the jurisdiction of the JQC. First, Allen addressed far different circumstances in the appellate context. Additionally, this argument reads Allen far too broadly. The Allen decision rejected Judge Allen’s attempt to use the doctrine of judicial independence to justify his actions by noting that his extrajudicial conduct was not “germane to the case at bar [or] the facts that [were] within the record of the case.” Id However, nothing in that decision established that the jurisdiction of the JQC is limited to instances of judicial conduct that are unrelated to a case.
Alternatively, the JQC refers to this Court’s pronouncement in In re Taunton, 357 So.2d 172 (Fla.1978), where the Court said,
There are, of course, limits that every judicial officer must observe. Judges are required to follow the law and apply it fairly and objectively to all who appear before them. No judge is permitted to substitute his concept of what the law ought to be for what the law actually is. He may exercise his judicial discretion conservatively or liberally, and he may temper justice with mercy, but he may not deny justice to any person. He may not withhold justice from one litigant in favor of another for whatever reason. Every judge is answerable for excesses or abuse of his awesome power. There is no place in our system for justice by whim or capricious notion. Regardless of the philosophy to which a justice or judge subscribes, he is not permitted to conduct himself in a manner which is unbecoming to a member of the judiciary and which demonstrates an unfitness to hold office.
Id at 179. Taunton effectively conveys the notion that judicial independence, while important, is not limitless.
This Court has not precluded the JQC from investigating judges accused of similar conduct in the past. For example, in In re Aleman, 995 So.2d 395 (Fla.2008), the judge was disciplined for failing to provide defense counsel with an adequate amount of time to prepare proper written motions to recuse and for inappropriately threatening to hold defense counsel in contempt with regard to the preparation of those motions. The JQC found that the judge’s conduct was “arrogant, discourteous, and impatient, as well as inadequate, improper, unacceptable, and unreasonable.” Id at 399 (internal quotation marks omitted). Similar to the facts here, Judge Aleman was accused of reacting improperly to a motion to recuse.
Another example of proper JQC investigative action in circumstances similar to the case before us can be found in In re Sloop, 946 So.2d 1046 (Fla.2006). In Sloop, several citizens appeared in the Seminole County courthouse to respond to traffic charges, but arrived at the wrong courtroom after being misdirected by *590 courthouse personnel. See id. at 1050. After they did not appear in Judge Sloop’s courtroom, Judge Sloop simply issued warrants for their immediate arrests and then proceeded to go to lunch. See id. Despite being informed that the individuals had eventually reported to his courtroom, he refused to rescind the warrants. See id. This Court concluded its opinion by stating, “We hope that our decision today will remind all judges of their solemn obligation to ‘personally observe’ high standards of conduct ‘so that the integrity and independence of the judiciary may be preserved.’ ” Id. at 1060 (quoting Fla.Code of Jud. Conduct, Canon 1). Here, the allegations against Judge Eriksson certainly challenge the integrity and independence of the judiciary, and thus an investigation was warranted.
The JQC has an internal filter that guards the principles of judicial independence. First, the JQC decides which allegations of judicial conduct warrant an investigation. Second, an investigative panel decides which cases warrant a full hearing. Until an investigative panel recommends a full hearing, the accusations remain confidential. Third, a hearing panel conducts a full hearing and requires the JQC to establish misconduct by clear and convincing evidence for each individual allegation. Lastly, the charges for which the hearing panel finds misconduct are submitted to this Court for yet another level of scrutiny. Judicial independence is guarded at each phase of the judicial discipline process, and this case is no exception. The doctrine of judicial independence did not preclude the JQC from proceeding with these specific charges against Judge Eriksson.
Judge Eriksson’s Statements to the Investigative Panel
Judge Eriksson next argues that both the Hearing Panel and this Court should be precluded from considering any evidence presented to the Investigative Panel because Article V, section 12(a)(4) of the Florida Constitution specifically provides that “[ujntil formal charges against a justice or judge are filed by the investigative panel with the clerk of the supreme court of Florida all proceedings by or before the commission shall be confidential.” (Emphasis supplied.) We reject this reading of the Florida Constitution because it is inconsistent with past practices of the JQC and the precedent of this Court.
In Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), the Supreme Court of the United States held:
The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication ... must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.
Id. at 47, 95 S.Ct. 1456. The JQC refers to Koehler v. Florida Real Estate Commission, 390 So.2d 711 (Fla.1980), to establish that this Court has applied the above-mentioned language to bifurcated hearings in Florida. Even though Koehler applied Withrow to the administrative law field, the same principles apply here in the context of judicial discipline. Koehler, through its adoption of Withrow, held that “[t]he ‘mere exposure to evidence’ in the investigative phase of a proceeding ... is ‘insufficient in itself to impugn the fairness’ of board members when they later sit in judgment.” Koehler, 390 So.2d at 713 *591 (quoting Withrow, 421 U.S. at 55, 95 S.Ct. 1456). The finding that someone involved in the investigation of an allegation may later adjudicate that same allegation and not violate due process applies to the judicial disciplinary context as it does to the administrative law framework.
While this Court has not explicitly adopted Withrow in the judicial context, the analysis of Withrow from other jurisdictions is persuasive. In Mississippi Commission on Judicial Performance v. Russell, 691 So.2d 929 (Miss.1997), the Supreme Court of Mississippi found that the state’s bifurcated judicial disciplinary process presented “no more evidence of bias or the risk of bias ... than inheres in the very fact that the Board had investigated and would now adjudicate.” Id. at 946 (quoting Withrow, 421 U.S. at 54, 95 S.Ct. 1456). In Mosely v. Nevada Commission on Judicial Discipline, 117 Nev. 371, 22 P.3d 655 (Nev.2001), the Supreme Court of Nevada held that, “[ajlthough the Court’s ruling concerned an administrative agency and not, as here, a court of judicial performance, we conclude that Withrow is otherwise indistinguishable and therefore dispositive.” Id. at 660.
Further, this Court’s justification for the confidentiality requirement in JQC investigations is inconsistent with Judge Eriksson’s argument. In In re Graziano, 696 So.2d 744 (Fla.1997), this Court explained that confidentiality allows the JQC to efficiently process complaints from any and all sources while protecting the complainant from recriminations and the judicial officer from unsubstantiated charges. See id. (citing Forbes v. Earle, 298 So.2d 1, 4 (Fla.1974)). In Forbes, we clarified the justification for confidentiality in judicial discipline investigations:
The need and reason for confidentiality is set forth by the American Bar Association Commission on Standards of Judicial Administration which recommends:
Except in the most extreme situations, the requirements of verification and disclosure of identity stifle complaints and thereby frustrate the objective of securing public confidence in the courts’ willingness to police themselves. The provision that investigations be confidential has proven to be abundant safeguard for the judge who has been unfairly accused.
Forbes, 298 So.2d at 4. The confidentiality of the 6(b) hearings is thus aimed at protecting judges from unsubstantiated claims, not meritorious claims that advance to a hearing panel. See id. Judge Eriksson does not provide any authority to support his unique interpretation of article V, section 12 of the Florida Constitution.
Further, this Court has upheld numerous cases in which findings from a hearing panel have relied on evidence presented during the investigative phase of a JQC proceeding. For example, in In re Ford-Kaus, 730 So.2d 269 (Fla.1999), a judge was accused of overbilling a client while running for office. The judge told an investigative panel that the overbilling was the fault of her secretary. See id. at 275. The Hearing Panel later discovered that the judge did not employ a secretary at the time the alleged overbilling occurred and, after probing the judge on her prior testimony, concluded that the judge had been untruthful. See id. This Court not only upheld the findings and recommendations of the hearing panel, it also factored dishonesty into its decision to remove the judge from office. See id. at 275-77.
Accordingly, we find that the Hearing Panel was authorized to consider the testimony of Judge Eriksson that was presented during the investigative proceeding before the filing of the Notice of Formal Charges.
*592 Clear and Convincing Evidence
The Florida Constitution vests this Court with the ultimate responsibility to determine the parameters of judicial misconduct that constitutes prohibited behavior. Specifically, article V, section 12(c)(1) provides that “[t]he supreme court may accept, reject, or modify in whole or in part the findings, conclusions, and recommendations of the [judicial qualifications] commission and it may order that the justice or judge be subjected to appropriate discipline.” In In re Graziano, 696 So.2d 744 (Fla.1997), we described that process:
Before reporting findings of fact to this Court, the JQC must conclude that they are established by clear and convincing evidence. In re McAllister, 646 So.2d 173, 177 (Fla.1994). This Court must then review the findings and determine whether they meet this quantum of proof, a standard which requires more proof than a “preponderance of the evidence” but ... less than “beyond and to the exclusion of a reasonable doubt.” In re Davey, 645 So.2d 398, 404 (Fla.1994). If the findings meet this intermediate standard, then they are of persuasive force and are given great weight by this Court. See In re LaMotte, 341 So.2d 513, 516 (Fla.1977). This is so because the JQC is in a position to evaluate the testimony and evidence first-hand. See In re Crowell, 379 So.2d 107 (Fla.1979). However, the ultimate power and responsibility in making a determination rests with this Court. Id.
696 So.2d at 753.
Count I
Judge Eriksson contends that there is no clear and convincing evidence to support the JQC’s finding that he violated the Code of Judicial Conduct in his revocation of Mr. Walton’s bond. Instead, Judge Eriksson argues that his conduct was within his discretion as provided by both statutory and case law. We disagree.
Judge Eriksson argues his revocation of Mr. Walton’s bond was consistent with Florida law. To support his contention he relies on a number of cases directed to the proposition that a judge should deny a motion to recuse if the motion is made to delay or frustrate proceedings. See Fleck v. State, 956 So.2d 548 (Fla. 2d DCA 2007); Deren v. Williams, 521 So.2d 150 (Fla. 5th DCA 1988). Judge Eriksson also refers to this Court’s recognition of “the frustration of trial judges who are burdened with belligerent defendants who attempt to thwart the system any way they can.” State v. Young, 626 So.2d 655, 657 (Fla.1993).
While these decisions may support a rejection of Mr. Walton’s motion to recuse, they certainly do not sustain the extreme conduct displayed by Judge Eriksson here. This Court has held that “[w]here a party discovers mid-trial or mid-hearing that a motion for disqualification is required, he or she may request a brief recess — which must be granted — in order to prepare the appropriate documents.” Rogers v. State, 630 So.2d 513, 516 (Fla.1993). Furthermore, this Court has held that when a motion to disqualify a judge is made, “until the matter is resolved the trial court cannot proceed.” Fuster-Escalona v. Wisotsky, 781 So.2d 1063, 1065 (Fla.2000) (citing § 38.10, Fla. Stat. (1993)). Even if Judge Eriksson justifiably believed that the motion to recuse was filed without merit, this in no way creates a right for a judicial officer to punish the defendant for exercising his legal rights. Judge Eriksson, through his testimony before the investigatory panel, has admitted that the only reason he increased bond for Mr. Walton and effectively placed him in jail was because Mr. Walton indicated his desire for recusal.
*593 Judge Eriksson claims to have relied on other decisions in his county where the circuit court, acting in an appellate capacity, upheld bond revocations in similar instances. Although his rationale may or may not be supported by other cases in his circuit, it does not provide an excuse for his conduct. Judge Eriksson’s testimony before the investigatory panel indicates a clear intent to retaliate against Mr. Walton for filing a motion to recuse. Regardless of how another judge may have ruled in unrelated circumstances, Judge Eriksson’s conduct cannot be condoned.
Judge Eriksson essentially believes that if a judge believes a defendant who exercises a legal right is attempting to interfere with the orderly administration of justice, the judge has the right to react to the defendant by inflicting punishment upon him or her. However, even if a defendant knows that the exercise of a legal right may interfere with the orderly administration of justice, a judge cannot punish the defendant solely for exercising that legal right. To approve that approach would have a chilling effect on defendants who legitimately seek to exercise their legal rights and is contrary to the fundamental principles of due process.
In defending his conduct for Count I, Judge Eriksson claims to have relied upon other judges in his county revoking bond for defendants when they felt it interfered with with the orderly administration of justice. However, this Court has held that “neither the alleged misconduct of others nor the good motives of a judge excuse departure from the guidelines established in the Code of Judicial Conduct.” In re Barnes, 2 So.3d 166, 171 (Fla.2009) (citing In re Shea, 759 So.2d 631, 638-39 (Fla.2000)).
We therefore find the JQC’s findings for Count I are supported by clear and convincing evidence.
Count III
The Hearing Panel was of the view that Judge Eriksson employed an “unduly rigid and formulaic process in dealing with pro se litigants, so as to impede their ability to obtain the relief and protection they sought from the court.” The JQC found that Judge Eriksson applied an overly technical and rigid approach in the manner in which he conducted domestic violence injunction proceedings. A review of the evidence demonstrates that the JQC’s findings of fact in this regard are supported by clear and convincing evidence.
This Court has “recognized the importance of the constitutional guarantee of citizen access to the courts, with or without an attorney.” State v. Spencer, 751 So.2d 47, 48 (Fla.1999) (citing Rivera v. State, 728 So.2d 1165, 1166 (Fla.1998)). In the context of domestic and repeat violence, section 741.30(l)(f) of the Florida Statutes (2009), states, “This cause of action for an injunction shall not require that either party be represented by an attorney.” To ensure that potential victims of domestic violence have access to the courts, the Legislature waived the filing fee for domestic violence petitions. See § 741.30(2)(a), Fla. Stat. (2009).
The JQC’s finding of misconduct was essentially based on a number of related judicial actions by this judge. All of this conduct penalized pro se petitioners for being unfamiliar with the judicial system. First, Judge Eriksson dismissed injunction petitions because petitioners did not know they were allowed to testify in connection with their own cases and at least implied that some independent witness was necessary. Instead of simply inquiring whether the petitioners wanted to testify, Judge Eriksson asked, “Who is your first witness?” After the petitioners failed to pro *594 duce independent witnesses, Judge Eriksson dismissed the petitions. This occurred even though each petitioner could have testified in his or her own case. Additionally, cases had statements under oath already in the files. Judge Eriksson asserts that no statute or prior case requires him to inform petitioners of their rights. Instead, Judge Eriksson claimed he was unable to inform them of their rights because this would be assuming an adversarial role. Judge Eriksson eventually did assist some petitioners by asking them if they would like to testify, but only after dismissing a number of injunctions for failing to produce any independent, separate evidence. Judges who appeared before the Hearing Panel indicated that some county court judges routinely explain the rights of both the petitioners and respondents prior to the commencement of these injunction proceedings.
Judge Eriksson also dismissed a number of petitions that, in his opinion, relied on hearsay evidence. This Court has held that a failure to object to hearsay evidence constitutes a waiver. See Rhodes v. State, 638 So.2d 920, 924 (Fla.1994). Inconsistent with Judge Eriksson’s assertion that he must remain neutral, Judge Eriksson refused to allow police reports to be used by petitioners as evidence because he, without any objection raised by the opposing party, deemed the reports hearsay. Judge Eriksson refused to insert himself into the controversy when petitioners did not know they had a right to testify on their behalf, but had no problem with rejecting potential hearsay evidence sua sponte.
Judge Eriksson’s conduct is particularly disturbing when viewed in light of his open disagreement with the manner in which domestic violence injunctions are processed in his circuit. Judge Eriksson argues that, unlike Judge Cliff Barnes, all of his correspondence with this Court and the Office of the State Courts Administrator was conveyed through proper legal channels. See In re Barnes, 2 So.3d 166 (Fla.2009). While this may be true, Judge Eriksson’s extrajudicial questioning during the injunction hearings was improper and in violation of the Code of Judicial Conduct. By asking extrajudicial questions such as, “Who sent you here?” and “Who told you to file this?” Judge Eriksson made his displeasure with being required to adjudicate domestic violence petitions abundantly clear. Even if this Court were to accept Judge Eriksson’s contention that his questions to petitioners regarding how they learned about the injunction process were performed in an academic and curious manner, the questions were not relevant to the cases at hand and reflected his intolerant attitude. The courtroom is not the proper venue for Judge Eriksson to express his disagreement with what he perceived to be a serious flaw with the system.
Accordingly, we find the JQC’s findings for Count III are supported by clear and convincing evidence.
Discipline
In In re Sloop, 946 So.2d 1046, 1049 (Fla.2006), this Court stated, “judges stand at the pinnacle of the justice system, and each judge in this State represents the face of justice. This is particularly the case in county court, a ‘people’s court’ where ordinary citizens come to resolve minor disputes and transgressions, often without counsel.” Instead of promoting the accessibility of the judicial system, Judge Eriksson discouraged vulnerable individuals from exercising their access to justice. Further, Judge Eriksson’s retaliation, whatever his intentions, against a defendant seeking to exercise a legitimate legal right certainly constitutes conduct that is unbecoming to members of the *595 judiciary. This conduct is inconsistent with Canon 1 (“A Judge Shall Uphold the Integrity and Independence of the Judiciary”),[2] Canon 2 (“A Judge Shall Avoid Impropriety and the Appearance of Impropriety in all of the Judge’s Activities”),[3] and Canon 8 (“A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently”).[4] The evidence establishes by *596 clear and convincing evidence that Judge Eriksson’s conduct was in violation of the Code of Judicial Conduct.
The JQC recommends that Judge Eriksson be publicly reprimanded by this Court and ordered to pay the costs of these proceedings. Judge Eriksson does not dispute that this is an appropriate recommendation for the types of violations that the JQC has determined occurred. The Hearing Panel noted that Judge Eriksson has recognized his own shortcomings, engaged in counseling, and was confident that no similar conduct will occur in the future. In light of these mitigating factors, the Hearing Panel concluded that no further disciplinary penalty is necessary beyond a public reprimand and payment of costs. This discipline is appropriate when compared to that imposed in similar cases. See In re Barnes, 2 So.3d 166 (Fla.2009) (approving recommendation for public reprimand where judge failed to act in manner which promoted impartiality of judiciary); In re Kelly, 238 So.2d 565, 567-74 (Fla.1970) (disciplining judge by public reprimand where judge filed a petition with the clerk of the circuit court criticizing the legal system in violation of the Canons of Judicial Ethics).
For the reasons stated, we approve the JQC’s recommendations, findings of fact, and conclusion that Judge Eriksson violated the Code of Judicial Conduct. We approve the JQC’s recommendations that Judge Eriksson be publicly reprimanded and charged the cost of the proceedings. In accordance with the policy announced in In re Frank, 753 So.2d 1228, 1242 (Fla.2000), we hereby command Judge Ralph E. Eriksson to appear before this Court for the administration of a public reprimand at a time to be established by the Clerk of this Court.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, and LABARGA, JJ., concur.
CANADY and POLSTON, JJ., concur in result only.
PERRY, J., recused.

. The Hearing Panel found against Judge Eriksson on Counts I and III, but rejected Count II. Therefore, we do not address the facts or merits of Count II.

. Canon 1. A Judge Shall Uphold the Integrity and Independence of the Judiciary
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

. Canon 2. A Judge Shall Avoid Impropriety and the Appearance of Impropriety in all of the Judge's Activities
A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

. Canon 3. A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently
[[Image here]]
B. Adjudicative Responsibilities
(1) A judge shall hear and decide matters assigned to the judge except those in which disqualification is required.
(2) A judge shall be faithful to the law and maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor, or fear of criticism.
(3) A judge shall require order and decorum in proceedings before the judge.
(4) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials, and others subject to the judge’s direction and control.
(5) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status, and shall not permit staff, court officials, and others subject to the judge’s direction and control to do so. This section does not preclude the consideration of race, sex, religion, national origin, disability, age, sexual orientation, socioeconomic status, or other similar factors when they are issues in the proceeding.
(6) A judge shall require lawyers in proceedings before the judge to refrain from manifesting, by words, gestures, or other conduct, bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status, against parties, witnesses, counsel, or others. This Section 3B(6) does not preclude legitimate advocacy when race, sex, religion, national origin, disability, age, sexual orientation, socioeconomic status, or other similar factors are issues in the proceeding.
(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:
(a) Where circumstances require, ex parte communications for scheduling, administrative purposes, or emergencies that do not deal with substantive matters or issues on the merits are authorized, provided:
(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and
(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.
(b) A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice and affords the parties reasonable opportunity to respond.
(c) A judge may consult with other judges or with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities.
*596 (d) A judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge.
(e) A judge may initiate or consider any ex parte communications when expressly authorized by law to do so.
(8) A judge shall dispose of all judicial matters promptly, efficiently, and fairly.
(9) A judge shall not, while a proceeding is pending or impending in any court, make any public comment that might reasonably be expected to affect its outcome or impair its fairness or make any nonpublic comment that might substantially interfere with a fair trial or hearing. The judge shall require similar abstention on the part of court personnel subject to the judge’s direction and control. This Section does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court. This Section does not apply to proceedings in which the judge is a litigant in a personal capacity.
(10) A judge shall not, with respect to parties or classes of parties, cases, controversies or issues likely to come before the court, make pledges, promises or commitments that are inconsistent with the impartial performance of the adjudicative duties of the office.
(11) A judge shall not commend or criticize jurors for their verdict other than in a court order or opinion in a proceeding, but may express appreciation to jurors for their service to the judicial system and the community.
(12) A judge shall not disclose or use, for any purpose unrelated to judicial duties, nonpublic information acquired in a judicial capacity.